RENE DRY WALL CO., INC. *v.* STRAWBERRY HILL ASSOCIATES ET AL.

COTTER, C. J., BOGDANSKI, SPEZIALE, PETERS and PARSKEY, Js.

Argued November 13—decision released December 23, 1980

*Gerald R. Lublin,* for the appellant (plaintiff).

*Roy H. Scharf,* for the appellee (named defendant).

PETERS, J.  This is an action by a subcontractor to foreclose a mechanic's lien against a landowner whose property was improved by the subcontractor's work.  The plaintiff, Rene Dry Wall Co., Inc., sued the defendant, Strawberry Hill Associates, to recover for work done pursuant to a contract with the defendant's general contractor, United Construction Ltd.[1]  The defendant's principal defense was that it was excused from obligation to the plaintiff because of good faith payments to the general contractor before notice of the plaintiff's lien and because of expenditures reasonably incurred to complete the construction project after the general contractor's default.  The trial court found that this special defense had been proved and rendered judgment accordingly.  The plaintiff has appealed.

Many of the facts underlying this litigation are no longer in dispute.  Strawberry Hill Associates (hereinafter Strawberry Hill), as owner, entered into a written contract on November 1, 1977, with

---

[1] Although there were other subcontractors also involved as parties in the litigation in the trial court, only the dispute between the plaintiff and the named defendant is currently before us on this appeal.

United Construction, Ltd. (hereinafter United Construction), as general contractor, for the construction of a commercial building in Guilford, at a contract price of $411,734. In February of the following year, United Construction hired Rene Dry Wall Co., Inc. (hereinafter Rene Dry Wall) to supply the labor and the materials for the dry wall work for this project at a contract price of $35,050. Rene Dry Wall worked on the job from April to June of 1978. At the time it stopped working, it had virtually completed the job, and was owed $34,050. Strawberry Hill decided, in mid-June, that United Construction was unable to complete the job and, on June 14, 1978, notified United Construction that it was terminated. Thereafter Strawberry Hill itself completed the project by entering into separate contracts with various contractors and subcontractors.

Rene Dry Wall had no direct contact with Strawberry Hill while United Construction was on the job. With respect to Rene Dry Wall's first bill of April 27, 1978, in the amount of $10,060, Rene Dry Wall executed a partial lien waiver at the request of United Construction and of Strawberry Hill's attorney. Rene Dry Wall never received this payment or any others, nor did it execute any further lien waivers. The day after Strawberry Hill's termination of United Construction, on June 15, 1978, Rene Dry Wall served a notice of mechanic's lien on Strawberry Hill. On June 19, 1978, its mechanic's lien was recorded on the Guilford land records. In late June, Rene Dry Wall, in a meeting with Strawberry Hill, made a direct demand for payment, which was refused.

During the spring of 1978, Strawberry Hill had made various progress payments, less ten percent

retainages, to United Construction for work then completed and approved by the architect. Certain of these progress payments, although payable to United Construction, were pre-endorsed by Strawberry Hill to designated subcontractors. At the time of these progress payments, Strawberry Hill had heard rumors that United Construction was delinquent in paying subcontractors and suppliers.

When Strawberry Hill took the project over from United Construction in mid-June of 1978, the work was not complete. Although Strawberry Hill then held retainages of $38,000, it eventually spent $49,311.85 in excess of the contract price to finish the job. Rene Dry Wall does not contest the fact that Strawberry Hill incurred these expenses, but it does challenge their reasonableness.

The legal issues in this case are framed by the statutory provisions governing mechanic's liens. The two provisions most directly relevant are General Statutes §§ 49-33[2] and 49-36,[3] which define and

[2] At the time of the filing of the lien General Statutes § 49-33 provided, in relevant part: "MECHANIC'S LIEN. PRECEDENCE. RIGHTS OF SUBCONTRACTORS. If any person has a claim for more than ten dollars for materials furnished or services rendered in the construction . . . of any building . . . and such claim is by virtue of an agreement with or by consent of the owner of the land upon which such building is being erected . . . such building, with the land . . . shall be subject to the payment of such claim. Such claim shall be a lien on such land, building and appurtenances . . . and shall take precedence over any other encumbrance originating after the commencement of such services, or the furnishing of any such materials, subject to apportionment as provided in section 49-36. . . . No mechanic's lien shall attach . . . in favor of any subcontractor to a greater extent in the whole than the amount which the owner has agreed to pay to any person through whom such subcontractor claims subject to the provisions of section 49-36. . . . [T]he total of such lien or liens shall not attach . . . to a greater amount in the whole than the amount by which the contract price between the owner and such person exceeds the reasonable cost . . . of satisfactory completion of the contract plus any damages resulting from

delimit the fund to which a properly noticed[4] mechanic's lien may attach. Both of these sections start with the proposition that no mechanic's lien may attach to any building or land in an amount greater than the price which the owner has agreed to pay to the general contractor for the building being erected or improved. This amount may be diminished to the extent that it exceeds "the reasonable cost . . . of satisfactory completion of the contract plus any damages resulting from . . . default for which [the general contractor] might be held liable to the owner." General Statutes § 49-33. The amount may be diminished further by "bona fide payments, as defined in section 49-36, made by the owner [to the general contractor] before receiving notice of [the mechanic's] lien or liens." General

such default for which such person might be held liable to the owner and all bona fide payments, as defined in section 49-36, made by the owner before receiving notice of such lien or liens. . . ." In the technical revision of title 49 in 1979, the material part of § 49-33 has become § 49-33 (f). Public Acts 1979, No. 79-602, § 86.

[3] At the time of the filing of the lien General Statutes § 49-36 provided, in relevant part: "LIENS LIMITED; APPORTIONMENT; PAYMENTS TO ORIGINAL CONTRACTOR. No such lien shall attach to any building or its appurtenances, or to the land on which the same stands . . . to a greater amount in the whole than the price which the owner agreed to pay for such building and its appurtenances . . . . When there are several claimants and the amount of their united claims exceeds such price, the claimants, other than the original contractor, shall be first paid in full, if the amount of such price is sufficient for that purpose; but, if not, it shall be apportioned among the claimants having such liens, other than the original contractor, in proportion to the amount of the debts due them respectively . . . but, in determining the amount to which any lien or liens shall attach . . . the owner . . . shall be allowed whatever payments he has made, in good faith, to the original contractor or contractors, before receiving notice of such lien or liens. . . ." In the technical revision of title 49 in 1979, these parts of § 49-36 have become §§ 49-36 (a), 49-36 (b) and 49-36 (c). Public Acts 1979, No. 79-602, § 92.

[4] It is uncontested that Rene Dry Wall properly gave notice of and filed its mechanic's lien.

Statutes § 49-33. See *Seaman* v. *Climate Control Corporation*, 181 Conn. 592, 593–94, 605, 436 A.2d 271 (1980).

These provisions make it clear that a contractor's right to recover on a mechanic's lien is not unlimited, despite the contractor's own good faith observance of the statutes. We have often noted that mechanic's lien legislation is remedial in nature, designed to furnish security for a contractor's labor and materials. *Camputaro* v. *Stuart Hardwood Corporation*, 180 Conn. 545, 550, 429 A.2d 796 (1980); *Stone* v. *Rosenfield*, 141 Conn. 188, 191, 104 A.2d 545 (1954); *City Lumber Co.* v. *Borsuk*, 131 Conn. 640, 645, 41 A.2d 775 (1945); *Balch* v. *Chaffee*, 73 Conn. 318, 320, 47 A. 327 (1900). Although this understanding of legislative purpose counsels generous construction in favor of the mechanic's lien, it does not permit us to extend the mechanic's lien beyond that which is authorized by the statutes. In *Camputaro*, supra, the contractor could not prevail because his work was not, within the statutes, lienable; here, the contractor's work is unquestionably lienable but his recovery is nonetheless subject to curtailment because of the conduct of the general contractor. If, as in this case, a general contractor receives progress payments that are not turned over to those who have done the work represented by the progress payments, and ultimately defaults entirely, the owner making such payments and completing such a job is protected as long as the owner acts in good faith and reasonably, as defined by the statutes. In determining whether the owner has met the statutory requirements of good faith and reasonableness, the trial court is making a finding of fact. See *Purcell, Inc.* v. *Libbey*, 111 Conn. 132, 139–41, 149 A. 225 (1930).

The plaintiff's appeal does not contest the applicable legal principles but argues instead that the trial court erred in two of its factual findings, in its determination that the defendant owner's payments to the general contractor had been made in good faith and in its determination that the defendant had incurred reasonable costs of completion in excess of the plaintiff's claim. Our review of a trial court's factual findings is limited to a consideration of whether the decisions of the trier were clearly erroneous in light of the evidence and the pleadings in the record as a whole. Practice Book, 1978, § 3060D; *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 220, 435 A.2d 24 (1980). We find no error here.

There was substantial evidence to support the trial court's finding that the payments made by the defendant were made in good faith. The statute, § 49-33, imposes no duty of inquiry upon the owner but rather affords protection for bona fide payments "made by the owner before receiving notice of such lien or liens." At best, the owner had information that the general contractor had been delinquent in making some payments to subcontractors, that the general contractor had requested that some checks be pre-endorsed to designated subcontractors, and that the plaintiff had executed one, only partial, lien waiver. In their totality, these facts do not demonstrate a lack of good faith. There was evidence neither of collusion with the general contractor designed to defeat the rights of the plaintiff, nor of misrepresentations by the defendant to the plaintiff to induce further performance than was financially warranted. The defendant's conduct is therefore readily distinguishable from the egregious misconduct which this court

characterized as constituting bad faith in *Purcell, Inc.* v. *Libbey,* 111 Conn. 132, 139–41, 149 A. 225 (1930).

The trial court also made findings of fact, challenged on this appeal, about the reasonableness of the costs incurred by the defendant to complete the job after the default of the general contractor. The statute allows the owner a credit for "the reasonable cost . . . of satisfactory completion of the contract plus any damages resulting from such default." General Statutes § 49-33. The trial court found that the cost of completion exceeded the contract price by $49,311.85; the parties are in apparent agreement that the unpaid contract price, at the time of default, included retainages in the amount of $38,000. Although there was no explicit finding that the defendant's expenditures were reasonable, such a conclusion is implicit in the trier's findings, and is supported by testimony that the defendant engaged in arm's length transactions with those whose work was required to complete the project.

The plaintiff's most telling attack on the conclusion of reasonableness focuses upon testimony elicited from Russell Waldo, one of the defendant's general partners. Waldo acknowledged that the defendant had paid a premium to some workmen to get the job done, and that the premium in some cases included paying former subcontractors for unpaid work performed while the general contractor was still in charge of the project. The plaintiff argues that it was unreasonable for the defendant to pay some but not all of the subcontractors left unpaid after the general contractor had been terminated. The plaintiff in essence complains that it was unfair not to recognize its claim, upon substan-

tial completion of its work, when others whose work came later were paid in full, merely because the owner still needed the services of the others in order to complete the job. The answer to this complaint is twofold. First, the statute imposes no absolute ban on preferential payment of some unpaid subcontractors, proscribing only payments, after notice of lien, to the original, general contractor. General Statutes § 49-36. Although § 49-36 does require pro rata allocation of proceeds among unpaid subcontractors, that provision does not come into play until it is determined that there are net proceeds available for distribution, taking into account the diminutions from the contract price authorized by §§ 49-33 and 49-36. Second, the possible unfairness of preferential treatment, as well as its possible justification in light of the exigencies of the market confronting the owner upon the general contractor's default, are elements to be considered by the trier of fact as part of the determination of reasonableness. The plaintiff's disappointment does not per se make the defendant's choices unreasonable.

As an adjunct to its disagreement with the trial court's finding of reasonableness, the plaintiff places special reliance on the fact that the contract between the general contractor and the defendant allocated certain funds as retainages, inter alia, for unsettled claims.[5] The plaintiff asks us in effect to impose a trust upon the $38,000 retainage at the time of termination. A retainage enters into the calculation of the unpaid contract price and thus into the deter-

---

[5] The contract between the owner and the general contractor contains, in article 5, provisions for progress payments "less such retainages as the Architect shall determine for all incomplete Work and unsettled claims." The contract, therefore, did not allocate all retainages to the settlement of unpaid claims.

mination of whether there will be net proceeds for allocation to unpaid subcontractors, in accordance with §§ 49-33 and 49-36. The statutes say nothing further with respect to the distribution of a retainage. We find no authority, either in the statutes or in our cases, to construe a contract provision for a retainage as imposing a fiduciary obligation on an owner for the benefit of unpaid subcontractors.

There is no error.

In this opinion the other judges concurred.